**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

JIONNI CONFORTI,

                  *Plaintiff,*

    v.

ST. JOSEPH'S HEALTHCARE SYSTEM,
INC.; ST. JOSEPH'S HOSPITAL AND
MEDICAL CENTER D/B/A ST. JOSEPH'S
REGIONAL MEDICAL CENTER; and
FATHER MARTIN D. ROONEY,

                  *Defendants.*

Case No. _____

**Jury Trial Demanded**

## COMPLAINT FOR DECLARATORY, COMPENSATORY, AND INJUNCTIVE RELIEF

Christopher T. Cook (N.J. Bar No. 015382012)
Jane M. Byrne*
Todd Anten*
David E. Farber*
QUINN EMANUEL URQUHART &
   SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
t: (212) 849-7000
f: (212) 849-7100

Omar Gonzalez-Pagan*
Demoya Gordon*
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
t: (212) 809-8585
f: (212) 809-0055

*pro hac vice* motions to be filed

*Attorneys for Plaintiff Jionni Conforti*

Plaintiff Jionni Conforti, by and through his attorneys, Quinn Emanuel Urquhart & Sullivan, LLP and Lambda Legal Defense and Education Fund, Inc., files this Complaint against St. Joseph's Healthcare System, Inc., St. Joseph's Hospital and Medical Center d/b/a St. Joseph's Regional Medical Center, and Father Martin D. Rooney (each a "Defendant," and together the "Defendants" or "St. Joseph's Healthcare"), and alleges as follows:

## LOCAL CIVIL RULE 10.1 STATEMENT

1.    The names and addresses of the parties to this action are as follows:

    a.    Plaintiff Jionni Conforti resides in Totowa, New Jersey.  Plaintiff's address: c/o Omar Gonzalez-Pagan, Lambda Legal Defense and Education Fund, Inc., 120 Wall Street, 19th Floor, New York, New York 10005;

    b.    Defendant St. Joseph's Healthcare System, Inc. ("SJHS") has its principal place of business at 703 Main Street, Paterson, New Jersey 07503;

    c.    Defendant St. Joseph's Hospital and Medical Center d/b/a St. Joseph's Regional Medical Center ("SJRMC") has its principal place of business at 703 Main Street, Paterson, New Jersey 07503; and

    d.    Upon information and belief, Defendant Father Martin D. Rooney resides in New Jersey; his street and post office address are unknown.

## INTRODUCTION

2.    Plaintiff Jionni Conforti ("Plaintiff" or "Jionni"), a man who is transgender, sought and was denied medically necessary access to treatment, services, and facilities by St. Joseph's Healthcare because of his sex, non-conformity with sex stereotypes, and gender identity.  St. Joseph's Healthcare's denial of access to such medical treatment, services, and facilities violates both Section 1557 of the Patient Protection and Affordable Care Act ("ACA"),

codified at 42 U.S.C. § 18116 ("Section 1557"), and the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5-1, *et seq.* (the "NJ LAD").

3.     In 2014, Jionni was diagnosed with gender dysphoria.  Then thirty-one years old, Jionni had long struggled with depression and anxiety rooted in the need to align himself with his true sex.  As part of his treatment for gender dysphoria, Jionni has received hormone therapy under the direction and supervision of his primary care physician as well as other medical treatment.

4.     In 2015, after receiving a recommendation that he undergo a hysterectomy as part of his treatment for gender dysphoria, Jionni consulted with Dr. Brian Day ("Dr. Day"), an experienced surgeon who at all relevant times had admitting privileges at SJRMC.  Dr. Day agreed to perform the surgery.  Jionni also obtained letters from both his primary care physician and his therapist that recommended that he undergo a hysterectomy, concluding that doing so was medically necessary for Jionni.  Jionni's decision to seek to undergo a hysterectomy was also based, in part, on a possible link between Jionni's hormone therapy and certain reproductive system cancers.

5.     SJRMC operates the two hospitals closest to Jionni's home at SJRMC's Paterson location and SJRMC's Wayne location ("SJW") in New Jersey, both of which are part of SJHS—one of New Jersey's leading health care systems.  As a result, Jionni and his family have a long history with both SJRMC's Paterson hospital and SJW, and relied on these hospitals for care in the past.

6.     SJRMC also has a nationally recognized Department of Obstetrics and Gynecology, where it routinely performs, among other surgeries, hysterectomies.

7.      On June 8, 2015, at the recommendation of Dr. Day, Jionni went to SJW to confirm that SJRMC could schedule his surgery.  The head nurse in charge of surgery at SJW assured Jionni that there would be no issues with his undergoing the hysterectomy either at SJW or SJRMC's Paterson location.

8.      Notwithstanding what the head nurse in charge of surgery at SJW told Jionni, on June 16, 2015, Dr. Day informed Jionni that the SJHS administration would not permit Jionni's surgery to be scheduled at its facilities because the procedure was being performed for the purpose of "gender reassignment."  The same day, Father Martin D. Rooney, Director of Mission Services at SJHS, sent Jionni an email stating:

> This is to follow up to your e-mail inquiring about scheduling a total hysterectomy here at St. Joseph's to remove all female parts based on the medical necessity for Gender Reassignment.  This is to inform you that as a Catholic Hospital we would not be able to allow your surgeon to schedule this surgery here at St. Joseph's.

As this email makes clear, St. Joseph's Healthcare denied Jionni's medically necessary hysterectomy from being performed at SJRMC because of: (1) Jionni's sex; (2) Jionni's nonconformity with sex stereotypes; and (3) Jionni's gender identity.

9.      As a result of this denial of access to medically necessary treatment, which followed Jionni having found a surgeon he felt comfortable with, and Jionni having been assured he could have his surgery at one of SJHS's hospitals, Jionni felt betrayed by St. Joseph's Healthcare and became deeply depressed.  In addition, this denial caused Jionni great anxiety, as he not only had to once again search for a surgeon whom he could trust to perform this highly sensitive surgical procedure, but he also became, and remains, anxious about visiting either SJRMC's Paterson hospital or SJW—the two hospitals closest to his home—for medical care. Due to the discrimination he suffered at the hands of St. Joseph's Healthcare, Jionni experiences

significant distress at the thought of having to attend either facility in the event of an emergency or otherwise.  In fact, 911 emergency services responding to a call at Jionni's home would automatically transport him to either SJRMC Paterson or SJW unless he were to hire and pay for transportation to another more distant hospital at his own cost.

10.     Jionni has suffered emotional distress, humiliation, embarrassment, and a loss of dignity at the hands of St. Joseph's Healthcare—who purportedly pride themselves on providing health care with a "patients first" approach.  St. Joseph's Healthcare's discriminatory actions are also contrary to the SJHS Patient Bill of Rights, which expressly entitles all patients to "treatment and medical services without discrimination based on . . . sex, . . . [and] gender identity or expression."

11.     St. Joseph's Healthcare's discriminatory actions violate both federal and New Jersey laws.  Section 1557 prohibits discrimination in the provision of health care on the basis of sex, failure to conform to sex stereotypes, or gender identity.  Similarly, the NJ LAD prohibits discrimination on the basis of sex and gender identity in places of public accommodation, including hospitals open to the public.

12.     Accordingly, Jionni brings these claims under Section 1557 and the NJ LAD to recover damages for the harms St. Joseph's Healthcare caused him, for a declaratory judgment that St. Joseph's Healthcare's actions violated Section 1557 and the NJ LAD, and for injunctive relief to mandate changes in St. Joseph's Healthcare's policies and practices to ensure the provision of non-discriminatory health care in compliance with St. Joseph's Healthcare's legal obligations, so that in the future St. Joseph's Healthcare will provide medically necessary care to all of their patients, regardless of sex, gender identity, or transgender status, as required under the law.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over Defendants SJHS and SJRMC with respect to Plaintiff's federal claim under Section 1557 asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has jurisdiction over all Defendants with respect to Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

14.     This Court has jurisdiction to declare the rights and legal relations of the parties and to order further relief pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court is authorized to issue permanent injunctive relief pursuant to Fed. R. Civ. P. 65.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants all reside or are present within this judicial district, and a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## THE PARTIES

16.     Plaintiff Jionni Conforti is a man who was born and continues to reside in Totowa, New Jersey.  He is transgender.

17.     SJHS is a not-for-profit holding corporation sponsored by the Sisters of Charity of Saint Elizabeth and is the principal provider of health care to the general public in Passaic County, New Jersey, through its network of wholly owned subsidiaries.  SJHS is a New Jersey-based health care organization receiving both federal and state financial assistance and revenue such as reimbursement, credits, subsidies, or contracts of insurance.

18.     SJRMC operates two hospitals:  (1) an acute-care hospital with 651 licensed beds with its principal place of business at 703 Main Street, Paterson, New Jersey 07503, and (2) SJW, an acute-care hospital with 229 licensed beds located in Wayne, New Jersey, which was merged with SJRMC effective January 1, 2010.  SJRMC is a wholly owned subsidiary of SJHS that provides health care to the general public in Passaic County, New Jersey.  SJRMC is a New

Jersey-based health care organization receiving both federal and state financial assistance and revenue such as reimbursement, credits, subsidies, or contracts of insurance.

19.     Defendant Father Martin D. Rooney is, and during all periods relevant to this Complaint was, SJHS's Director of Pastoral Care and Mission Services and an administrator of SJHS in the Department of Patient Relations.  Father Rooney is, and during all periods relevant to this Complaint was, listed as the primary contact person for all questions concerning the SJHS Patient Bill of Rights.

20.     Defendants SJHS and SJRMC are vicariously and/or contractually liable for the actions of their subsidiaries, directors, officers, agents, employees, and/or partners.

## FACTUAL BACKGROUND

### A.     Sex, Gender Identity, and Gender Dysphoria

21.     A person's sex is determined by multiple factors, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity.  These factors may not always be in alignment.

22.     The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth.  Typically, individuals are assigned a sex on their birth certificate solely on the basis of the appearance of external genitalia at the time of birth.  Additional determinants of a person's sex (such as a person's chromosomal makeup, for example) are typically not assessed or considered at the time of birth.

23.     Gender identity—a person's internal sense of their own gender—is the primary factor in determining a person's sex.  Every person has a gender identity.  There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

24.     Although there is not yet one definitive explanation for what determines gender identity, biological factors—most notably sexual differentiation in the brain—have a role in gender identity development.

25.     Because gender identity is the primary factor in establishing a person's sex and external genitalia are but one of a number of factors that make up a person's sex, external genitalia are not always determinative of a person's sex.

26.     Transgender individuals are people whose gender identity diverges from the sex they were assigned at birth.  A transgender man's sex is male (despite being incorrectly assigned the sex of female at birth) and a transgender woman's sex is female (despite being incorrectly assigned the sex of male at birth).

27.     Cisgender individuals are people whose gender identity aligns with the sex they were assigned at birth.  A cisgender man's sex is male and a cisgender woman's sex is female.

28.     Gender identity and transgender status are therefore inextricably linked to one's sex and are sex-related characteristics.

29.     Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth.

30.     Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), and by other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

31.     The DSM-5 was updated in May 2013 by the American Psychiatric Association to include a revision to the previously used term "Gender Identity Disorder" by replacing it with "Gender Dysphoria."

- 8 -

32.     As set forth in the DSM-5, the diagnostic criteria for gender dysphoria in

adolescents and adults are:

> A marked incongruence between one's experienced/expressed gender and
> assigned gender, of at least 6 months duration, as manifested by 2 or more of the
> following indicators:
>
> 1. A marked incongruence between one's experienced/expressed gender and
>    primary and/or secondary sex characteristics (or, in young adolescents, the
>    anticipated secondary sex characteristics).
>
> 2. A strong desire to be rid of one's primary and/or secondary sex
>    characteristics because of a marked incongruence with one's
>    experienced/expressed gender (or, in young adolescents, a desire to
>    prevent the development of the anticipated secondary sex characteristics).
>
> 3. A strong desire for the primary and/or secondary sex characteristics of the
>    other gender.
>
> 4. A strong desire to be of the other gender (or some alternative gender
>    different from one's assigned gender).
>
> 5. A strong desire to be treated as the other gender (or some alternative
>    gender different from one's assigned gender).
>
> 6. A strong conviction that one has the typical feelings and reactions of the
>    other gender (or some alternative gender different from one's assigned
>    gender).

33.     Gender dysphoria is also included in the International Classification of Diseases,

Tenth Revision, Clinical Modification ("ICD-10"), and was included in the International

Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9").

34.     If not properly treated, gender dysphoria may result in psychological distress,

anxiety, depression, and even self-harm or suicidal ideation.

35.     Gender dysphoria often intensifies with time.  The longer an individual goes

without treatment, the greater the risk of severe harms to the individual's physical and

psychological health.

36.     Medical treatment for gender dysphoria must be individualized and tailored to the medical needs of each patient.

37.     Treatment of gender dysphoria is usually provided pursuant to the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"), published by the World Professional Association for Transgender Health ("WPATH") and internationally recognized as the authoritative articulation of professional consensus on the treatment of gender dysphoria.

38.     Treatment in accordance with the Standards of Care may include changes in gender expression and role (*i.e.*, presenting and living in accordance with a person's gender identity in all aspects of life), mental health treatment, hormone therapy, and gender confirmation surgery to change primary and/or secondary sex characteristics.

39.     An established body of medical research demonstrates the effectiveness and medical necessity of mental health care, hormone therapy, and gender confirmation surgery as forms of treatment for many people diagnosed with gender dysphoria.  Health experts, including WPATH and the American Medical Association, have recognized that such treatments are not "cosmetic" or "experimental" and have recognized that these treatments can provide safe and effective treatment for a serious health condition.

40.     Gender confirmation surgery—sometimes called "sex reassignment" surgery—does not constitute a single procedure, but refers to any form of surgical procedure undergone by a transgender person to better align that person's bodily characteristics with his or her gender identity.  WPATH has issued guidance confirming that for some transgender individuals, a complete hysterectomy is essential and medically necessary to alleviate their gender dysphoria.

41.    Seeking medically necessary care to align one's sex characteristics with one's true sex, as determined by one's gender identity, inherently violates sex stereotypes.

**B.    St. Joseph's Healthcare System**

42.    SJRMC has a nationally recognized Department of Obstetrics and Gynecology where patients may choose from private physicians in the community.  Through its Department of Obstetrics and Gynecology, SJRMC also offers a robust Robotic Surgery program and routinely performs, among other surgeries, hysterectomies.

43.    Upon information and belief, in 2012, physicians at the SJRMC location performed 159 abdominal hysterectomies, and physicians at the SJW location performed 31 abdominal hysterectomies.  In 2016, SJRMC received an Excellence Award from Healthgrades for Gynecologic Surgery, including a "Hysterectomy Five-Star Rating," and was ranked in the Top 10% in the United States for Gynecologic Surgery.  SJRMC's 2016 Healthgrades Five-Star Hysterectomy rating was based on data showing a below-average complication rate for the 452 hysterectomy cases performed at SJRMC.  Healthgrades also determined that SJRMC performed approximately 160 more hysterectomies than the average hospital.

44.    Upon information and belief, in 2008 and 2009, surgeons at SJRMC performed at least 131 direct sterilization procedures, identified by ICD-9 code V25.2.  Direct sterilizations identified by ICD-9 code V25.2 represent non-pathology based requests for direct sterilization for contraceptive purposes.   In 2008 and 2009, in addition to the 131 direct sterilizations, surgeons at SJRMC also performed at least 98 tubal ligations.

45.    SJRMC actively promotes its gynecologic surgery services and offerings to the public, engaging in broad public solicitation both independently and in conjunction with surgeons affiliated with SJRMC.  SJRMC and associated doctors—including Dr. Day—actively

advertise their services for laparoscopic hysterectomies.  Dr. Roger P. Kierce, MD, the Chairman

of the Department of Obstetrics and Gynecology at SJRMC, has advertised SJRMC's

gynecologic surgery services, noting that "St. Joseph's Regional Medical Center is a highly

specialized tertiary health care delivery system that offers state-of-the-art, cutting-edge medical

and surgical care to our local and distant communities."

46.    SJHS and its subsidiary, SJRMC, receive substantial revenues from the state and

federal government by treating patients insured through Medicare, Medicaid, and through state-

based charity care payments.  According to SJHS's 2015 Audited Financial Statement, combined

revenue from the Medicare and Medicaid programs accounted for approximately 38% of SJRMC

net patient service revenue, exclusive of state subsidies for charity care, for both years ended

December 31, 2015 and 2014, respectively.  In addition, SJHS receives state funds through New

Jersey's Hospital Charity Care Program, which was established to provide state-funded charity

care payments to hospitals in New Jersey to offset the costs of uncompensated care delivered to

low-income uninsured patients.  In 2015, SJHS received charity care payments of approximately

$68 million and a special subsidy of approximately $9.7 million.

47.    SJHS's Patient Bill of Rights specifically mandates that all patients are entitled to

"Legal Rights," including "treatment and medical services without discrimination based on . . .

sex . . . [and] gender identity or expression."

48.    SJHS's website indicates that if a patient has questions concerning his or her

rights as articulated in the Patient Bill of Rights, the patient should contact Father Martin

Rooney.

49.    Jionni has been attending SJRMC, including SJW, his entire life.  He has visited

both the Paterson and SJW hospitals for various medical issues, including emergency care.  In

2007, Jionni underwent lumpectomy surgery at SJW.  Additionally, in 2010, Jionni underwent gall bladder surgery at SJW.

50.     Jionni's family also has extensive history at both of SJRMC's locations.  Jionni's father had an accident in 2010, after which he received extensive and ongoing medical treatment at both SJRMC Paterson and SJW.  In 2002, Jionni's mother was diagnosed with breast cancer and received much of her ensuing treatment at SJRMC Paterson and SJW.  She passed away at SJW in 2004.

**C.     Jionni's Gender Identity and Diagnosis of Gender Dysphoria**

51.     Jionni was assigned the sex of female at birth.  Since early childhood, Jionni has identified more with the male gender than the female gender, although he was unfamiliar with the terms transgender, gender dysphoria, and gender identity disorder until adulthood.  As a child, Jionni found himself preferring stereotypically male clothing, such as a suit and tie or a Yankees uniform.

52.     Following the death of his mother due to complications from breast cancer in 2004, Jionni, then twenty-one years old, began to present himself in a more masculine way.  He cut his hair short, threw out all of his stereotypically-female clothing, and began to dress and present as masculine.  At the time, Jionni often felt depressed, not understanding at the time that his desire to present himself as masculine was due to his gender dysphoria.

53.     In October 2013, Jionni married his wife.

54.     In early 2014, Jionni began to realize that his depression was due to the fact that his gender identity did not conform with his sex assigned at birth.  After watching a documentary featuring a transgender man and discussing the man's gender transition, Jionni identified with the experience of the subject of the documentary and began to watch videos posted by others on

YouTube describing their transition experiences.  In February 2014, Jionni joined a Facebook group involving transgender and transition-related topics and spoke with individuals in the group about transitioning.  Jionni felt that he immediately understood what others were discussing and knew that he had to move forward with his own transition and gender confirmation process.

55.    In June 2014, Jionni was diagnosed with gender dysphoria by his primary care physician, Dr. Ian Tang ("Dr. Tang").  Shortly after receiving this diagnosis, he began to take steps, at Dr. Tang's direction, to align himself with his true sex—*i.e.*, to transition in a manner consistent with his gender identity.  Jionni began receiving gender-confirming hormone therapy in June 2014.  Jionni continues to receive such medically necessary hormone therapy.

**D.    Jionni's Pursuit of Gender Confirmation Surgery**

56.    In consultation with his physicians, Jionni took steps to obtain a double mastectomy so that his physical appearance would reflect his gender identity.  This treatment was medically necessary to help Jionni align himself with his true sex, consistent with his gender identity.  He was referred to a surgeon in Texas and underwent a double mastectomy in October 2014.  Jionni's surgeon made him feel comfortable both during the surgery and his recovery.

57.    After completing his double mastectomy, Jionni discussed further gender confirmation surgery with Dr. Tang.  Jionni also discovered that there was a possible link between the hormone therapy he was receiving and certain reproductive system cancers.  In addition, Jionni's family has a history of cancer.  Due to these concerns, and in consultation with Dr. Tang, Jionni decided to continue with his gender confirmation by seeking to undergo a total hysterectomy.

58.    Jionni contacted several gynecologic surgeons in the local area to determine whether they could perform the surgery.  Ultimately, Jionni was referred to Dr. Day.  Dr. Day is

a surgeon and fellow of the American College of Obstetricians and Gynecologists, who practices at Totowa OB/GYN.

59.    Dr. Day is associated with and has admitting privileges at SJRMC's hospitals. Dr. Day has significant expertise in advanced minimally invasive and robotic gynecologic surgery, and routinely performs laparoscopic hysterectomies.

60.    On May 13, 2015, Jionni emailed Dr. Day's office explaining his desire to obtain a hysterectomy and his need for seeking it—*i.e.*, as treatment for his gender dysphoria.  Dr. Day responded that same day that he would be capable of performing the surgery and happy to do so.

61.    As required by Jionni's insurer, Amerigroup of New Jersey, Jionni obtained two referral letters from medical professionals recommending a total hysterectomy as medically necessary.

62.    Jionni's therapist Rissy Batista, LPC, of Rissy's Lighthouse Therapeutic Services, a mental health clinician affiliated with SJRMC, wrote one referral letter, in which she stated that "[a] full hysterectomy has been discussed at length and is currently recommended to complete full transition from female to male."

63.    Dr. Tang wrote the second referral letter, in which Dr. Tang confirmed that Jionni had been diagnosed with Gender Identity Disorder, an alternative and previously-used term for gender dysphoria.  Dr. Tang stated that undergoing a total hysterectomy is "necessary and highly beneficial for Mr. Confort[i]'s wellbeing."

64.    In the beginning of June, after several email exchanges with Dr. Day, Jionni scheduled an appointment at Dr. Day's office for June 16, 2015.  Dr. Day suggested to Jionni that prior to his June 16 appointment, Jionni should reach out to SJRMC to ensure that the hospital would be able to schedule the surgery.

65.     Following Dr. Day's suggestion, Jionni went to SJW on Monday, June 8, 2015 to speak to a representative in Patient Care Services to ensure that one of SJRMC's locations would be able to schedule his surgery.  Jionni again fully explained why he needed a hysterectomy.  At SJW, the head nurse of surgery in charge of set up and intake informed Jionni that there would be no issues with Jionni undergoing the hysterectomy procedure at either of SJRMC's locations based on the reason for surgery—treatment of Jionni's gender dysphoria.  She explained that all Jionni needed were letters from his physicians explaining that the surgery is medically necessary to treat his gender dysphoria, and final authorization from his health care insurance provider.

66.     Jionni also contacted SJHS through its "Contact Us" form on its website explaining why he needed a hysterectomy and inquiring whether there would be an issue scheduling the surgery at SJRMC.  Elizabeth Regula, the acting Executive Director of the St. Joseph's Regional Medical Center Foundation at the time, responded to Jionni's email on Thursday, June 11, 2015.  She stated that she received Jionni's email but would have to reach out to the administrative director of surgery to provide a more definitive answer.  On Friday, June 12, 2015, Jionni sent a follow-up email to Ms. Regula, who informed Jionni that he would receive a response on Monday, June 15, 2015.  Jionni did not hear back from Ms. Regula or any other SJHS representative prior to his June 16 appointment with Dr. Day.

**E.     Discrimination by SJHS, SJRMC, and Father Rooney**

67.     On June 16, 2015, Jionni had an in-person consultation with Dr. Day regarding scheduling his hysterectomy procedure.  At this consultation, Dr. Day told Jionni that Father Rooney, Director of Mission Services at SJHS, would not allow Jionni's surgery to be scheduled at SJHS's facilities, as the surgery was being performed for purposes of "gender reassignment."

68.     Dr. Day informed Jionni that because Dr. Day had admitting privileges only at SJRMC's two locations, Dr. Day would not be able to perform Jionni's hysterectomy at all.  Dr. Day told Jionni that Father Rooney would provide Jionni with the reason for SJHS's denial of medical services to Jionni in writing.

69.     On June 16, 2015, Father Rooney sent an email to Jionni stating, in pertinent part:

> This is to follow up to your e-mail inquiring about scheduling a total hysterectomy here at St. Joseph's to remove all female parts based on the medical necessity for Gender Reassignment.  This is to inform you that as a Catholic Hospital we would not be able to allow your surgeon to schedule this surgery here at St. Joseph's.

70.     Father Rooney prevented Jionni's medically necessary hysterectomy from being performed at SJRMC's hospitals because of Jionni's sex, nonconformity with sex stereotypes, gender identity, and transgender status.

71.     Upon reading Father Rooney's email, Jionni was shocked, confused, and hurt.

72.     Jionni felt betrayed by SJHS, the closest health care system to his home and one upon which he and his family had come to rely.  Jionni had not previously experienced such blatant discrimination and was humiliated and angered at being refused the facilities and services for medically necessary care because of who he is.

73.     Jionni was also depressed that after his long search to find a surgeon who could perform the surgery, and after initially being assured by SJRMC staff that performing the surgery at their facilities would not be an issue, he was denied access to medically necessary care.  Jionni also felt anxiety at having to search for a new surgeon whom he could trust to perform this highly sensitive surgical procedure.  Jionni worried it would severely impede his ability to live as his true self in accordance with his gender identity.

74.     Due to this discriminatory incident, Jionni has become wary of visiting either SJRMC or SJW for medical care and experiences distress at the thought of having to attend

either facility in the event of an emergency or otherwise.  SJHS provides the closest and most expansive health care treatment in the area.  The two hospitals closest to Jionni's home are operated by SJHS—SJRMC Paterson and SJW.  Moreover, if Jionni requires emergency assistance in the vicinity of his home through dialing 911, he would be transported by ambulance automatically to either SJRMC Paterson or SJW unless he were to hire and pay for transportation to another more distant hospital at his own cost.

75.     In October 2016, Jionni was involved in a vehicular accident in Wayne, New Jersey, near his home in Totowa, during which he sustained minor injuries and was evaluated by emergency service technicians.  The emergency service technicians recommended that Jionni obtain emergency care at a hospital and explained to him that they could only take him to the emergency care department at SJRMC Paterson or SJW.  The emergency service technicians noted that if Jionni wanted to be taken to another hospital farther away, he would have to pay for such transportation out of pocket.  Afraid that he would be discriminated against by SJHS and unable to pay for the ambulance transportation to another hospital, Jionni declined to be taken to a hospital by the emergency service technicians.

76.     St. Joseph's Healthcare's refusal to allow Jionni's hysterectomy to be performed at their facilities is particularly humiliating and degrading to Jionni because he knows SJRMC provides access to the very same laparoscopic hysterectomy procedure and related treatments to other patients who do not fail to conform to sex stereotypes and are not transgender.  For example, in 2009, Dr. Day performed a hysterectomy for an acquaintance of Jionni, a cisgender woman, at SJRMC Paterson.  Moreover, Dr. Day and other surgeons routinely perform total laparoscopic hysterectomies and direct sterilizations at SJRMC.

- 18 -

77.     Because the only individuals who require medically necessary care to treat gender dysphoria are transgender individuals, denying coverage for such health care constitutes discrimination based on sex, nonconformity with sex stereotypes, gender identity, and transgender status.  As a result of the actions and practices of St. Joseph's Healthcare, cisgender individuals can schedule and obtain hysterectomies as part of their medically necessary health care at SJRMC, but transgender individuals cannot.

78.     As a result of Father Rooney's, SJHS's, and SJRMC's denial of medically necessary treatment to Jionni based on Jionni's sex, nonconformity with sex stereotypes, gender identity, and transgender status, Jionni has suffered emotional distress, humiliation, embarrassment, and a loss of dignity.

79.     Jionni has not sought or obtained medical treatment from SJRMC Paterson or SJW since June 2015 because of this discriminatory incident.

## F.     OCR Complaint and Investigation

80.     On December 11, 2015, Jionni, by his counsel Lambda Legal Defense and Education Fund, Inc., filed a civil rights administrative complaint against SJRMC with the U.S. Department of Health and Human Services ("HHS") Office for Civil Rights ("OCR Complaint"). In the OCR Complaint, Jionni alleged, as he does here, that SJRMC discriminated against him on the basis of sex, in violation of Section 1557.   Attached to the OCR Complaint was the aforementioned email from Father Rooney to Jionni articulating the discriminatory reason for denying Jionni health care at SJRMC.

81.     On May 12, 2016, the Office of Civil Rights informed Jionni and his counsel that it had determined it had the authority to proceed with the OCR Complaint and indeed would be commencing an investigation into his allegations.  Notably, the Office of Civil Rights informed

Jionni and his counsel of this investigation one day prior to releasing its Final Rule expressly concluding that gender identity is encompassed within Section 1557's prohibition on sex discrimination in health care.

## CAUSES OF ACTION

### COUNT ONE – DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF SECTION 1557 OF THE ACA, 42 U.S.C. § 18116
**(Against Defendants SJHS and SJRMC)**

82.     Plaintiff realleges, adopts, and incorporates the allegations in paragraphs 1 through 81 above, as though fully set forth herein.

83.     Section 1557 of the ACA, 42 U.S.C. § 18116, provides, in relevant part, that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681, *et seq*.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

84.     Defendants SJHS and SJRMC receive federal financial assistance, and are therefore each a "covered entity" subject to the requirements of Section 1557.

85.     Discrimination on the basis of gender identity, transgender status, or nonconformity with sex stereotypes are all encompassed by the prohibition on discrimination on the basis of "sex" under Section 1557.

86.     In 2016, the HHS Office for Civil Rights issued a final rule defining "on the basis of sex" under Section 1557 of the ACA to include "discrimination on the basis of . . . gender identity."  45 C.F.R. § 92.4.  Accordingly, pursuant to HHS regulations implementing Section 1557, a covered entity such as Defendants SJHS and SJRMC must "provide individuals equal access to its health programs or activities without discrimination on the basis of sex," and "a

covered entity may not deny or limit health services that are ordinarily or exclusively available to individuals of one sex, to a transgender individual based on the fact that the individual's sex assigned at birth, gender identity, or gender otherwise recorded is different from the one to which such health services are ordinarily or exclusively available."  42 C.F.R. § 92.206.

87.     Jionni has a right under Section 1557 to receive health care services free from discrimination based on his sex, nonconformity with sex stereotypes, gender identity, or transgender status.  Indeed, Defendants SJHS and SJRMC's written policies acknowledge their responsibility to treat all individuals equally and not to discriminate on the basis of sex or gender identity or expression.

88.     By denying Jionni the ability and opportunity to schedule a hysterectomy at SJRMC because it was related to the medically necessary treatment for Jionni's gender dysphoria, Defendants SJHS and SJRMC discriminated against Jionni based on his sex, nonconformity with sex stereotypes, gender identity, and transgender status.  Defendants SJHS and SJRMC have discriminated against Jionni on the basis of sex in violation of Section 1557 and have thereby denied Jionni the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

89.     Defendants SJHS and SJRMC perpetrated this discrimination purposefully, willfully, with malice, and with reckless disregard for and/or with deliberate indifference toward Jionni's rights.

90.     As a result of Defendants SJHS and SJRMC's discriminatory acts, Jionni has suffered emotional distress, humiliation, degradation, embarrassment, emotional pain and anguish, violation of his dignity, loss of enjoyment of life, and other compensatory damages, in an amount to be established at trial.

**COUNT TWO – DISCRIMINATION BECAUSE OF SEX AND GENDER IDENTITY
IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION,
N.J. STAT. ANN. §§ 10:5-1, *et seq.*
(Against All Defendants)**

91.     Plaintiff realleges, adopts, and incorporates the allegations in paragraphs 1 through 90 above, as though fully set forth herein.

92.     The NJ LAD, N.J. Stat. Ann. § 10:5-4 provides, in relevant part:

All persons shall have the opportunity . . . to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, . . . without discrimination because of . . . sex, gender identity or expression . . . . This opportunity is recognized as and declared to be a civil right.

93.     The NJ LAD, N.J. Stat. Ann. § 10:5-12(f)(1) provides, in relevant part:

It shall be . . . an unlawful discrimination . . . [f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof . . . on account of the . . . sex, gender identity or expression . . . of such person . . . .

94.     New Jersey enacted the Law Against Discrimination in recognition that "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State."  N.J. Stat. Ann. § 10:5-3.

95.     The NJ LAD provides an extensive, non-exhaustive list of examples of businesses and places that would constitute "[a] place of public accommodation," including "any dispensary, clinic or hospital."  N.J. Stat. Ann. § 10:5-5(l).

96.     Under New Jersey law, "'Gender identity or expression' means having or being perceived as having a gender related identity or expression whether or not stereotypically associated with a person's assigned sex at birth."  N.J. Stat. Ann. § 10:5-5(rr).

97.     New Jersey law explicitly delineates the responsibility of hospitals and hospital administrators to protect patient rights to treatment and medical services without discrimination based on sex or diagnosis.  New Jersey law provides, in relevant part:

> Every New Jersey hospital patient shall have the following rights, none of which shall be abridged by the hospital or any of its staff.  The hospital administrator shall be responsible for developing and implementing policies to protect patient rights and to respond to questions and grievances pertaining to patient rights. These rights shall include at least the following:
>
> . . .
>
>   2.  To treatment and medical services without discrimination based on . . . sex . . . [or] diagnosis . . .;
>
>   3.  To retain and exercise to the fullest extent possible all the constitutional, civil, and legal rights to which the patient is entitled by law;"

N.J. Admin. Code § 8:43G-4.1.

98.     Jionni has a right under the NJ LAD to receive health care services free from discrimination based on his sex, nonconformity with sex stereotypes, gender identity or expression, or transgender status.

99.     By denying Jionni the ability and opportunity to schedule a hysterectomy at SJRMC because it was related to the medically necessary treatment for Jionni's gender dysphoria, Defendants discriminated against Jionni based on his sex, gender identity, transgender status, and nonconformity with sex stereotypes.  Defendants have discriminated against Jionni on the basis of sex and gender identity in violation of the NJ LAD and have thereby denied Jionni the full and equal opportunity to obtain all the accommodations, advantages, facilities, and privileges of a place of public accommodation free from discrimination.

100.     Defendants perpetrated this discrimination purposefully, willfully, with malice, and with reckless disregard for and/or with deliberate indifference toward Jionni's rights.

101.   As a result of Defendants' acts of discrimination, Jionni has suffered emotional distress, humiliation, degradation, embarrassment, emotional pain and anguish, violation of his dignity, loss of enjoyment of life, and other compensatory damages, in an amount to be established at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.   Issue a declaratory judgment finding that Defendants have violated Plaintiff's rights under Section 1557 and the NJ LAD.

B.   Issue a permanent injunction against Defendants, their agents, employees, successors, and all others acting in concert with them:

1. Ordering Defendants, their agents, employees, successors, and all others acting in concert with them, to refrain from discriminating on the basis of sex, nonconformity with sex stereotypes, gender identity or expression, transgender status, and/or diagnosis of gender dysphoria in the provision of health care services, treatment, and facilities;

2. Ordering Defendants, their agents, employees, successors, and all others acting in concert with them, to provide transgender individuals, including Plaintiff, who seek gender confirmation or gender dysphoria-related health care, with medical assistance for all medically necessary care, regardless of its nature, when such care is provided to or made available to cisgender individuals; and

3. Ordering Defendants, their agents, employees, successors, and all others acting in concert with them, to modify their policies, practices, and procedures to ensure the provision of non-discriminatory medically necessary care to all of

their patients, without regard to sex, sex stereotypes, gender identity or expression, transgender status, or diagnosis of gender dysphoria.

C.      Award Plaintiff compensatory damages in an amount to be established at trial for his emotional distress and suffering, embarrassment, humiliation, emotional pain and anguish, violation of his dignity, and loss of enjoyment of life.

D.      Award Plaintiff punitive damages, to the extent allowed by federal or state law.

E.      Award Plaintiff costs and disbursements, including reasonable attorneys' fees and costs.

F.      Award Plaintiff such other and further legal and equitable relief as the Court may deem appropriate, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues properly triable by right to a jury.


DATED:  January 5, 2017                              Respectfully Submitted,

                                        By:  s/ *Christopher T. Cook*
                                             Christopher T. Cook (N.J. Bar No. 015382012)
                                             Jane M. Byrne*
                                             Todd Anten*
                                             David E. Farber*
                                             QUINN EMANUEL URQUHART &
                                                  SULLIVAN, LLP
                                             51 Madison Avenue, 22nd Floor
                                             New York, New York 10010-1601
                                             t: (212) 849-7000
                                             f: (212) 849-7100

                                             Omar Gonzalez-Pagan*
                                             Demoya Gordon*
                                             LAMBDA LEGAL DEFENSE AND
                                                  EDUCATION FUND, INC.
                                             120 Wall Street, 19th Floor
                                             New York, New York 10005
                                             t: (212) 809-8585
                                             f: (212) 809-0055

                                             **pro hac vice* motions to be filed

                                             *Attorneys for Plaintiff Jionni Conforti*

## <u>LOCAL CIVIL RULE 11.1 CERTIFICATION</u>

The undersigned hereby certifies that the matter in controversy is the subject of an

administrative complaint filed with the U.S. Department of Health and Human Services Office

for Civil Rights on December 11, 2015.

DATED:  January 5, 2017                              QUINN EMANUEL URQUHART &
                                                    SULLIVAN, LLP


By:  s/ *Christopher T. Cook*
     Christopher T. Cook (N.J. Bar No. 015382012)
     Jane M. Byrne*
     Todd Anten*
     David E. Farber*
     51 Madison Avenue, 22nd Floor
     New York, New York 10010-1601
     t: (212) 849-7000
     f: (212) 849-7100

     Omar Gonzalez-Pagan*
     Demoya Gordon*
     LAMBDA LEGAL DEFENSE AND
        EDUCATION FUND, INC.
     120 Wall Street, 19th Floor
     New York, New York 10005
     t: (212) 809-8585
     f: (212) 809-0055

     *pro hac vice* motions to be filed

     *Attorneys for Plaintiff Jionni Conforti*

- 27 -